# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JAMES TANNEHILL, II, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.  2:08-cv-01142-HGD |
| | ) | |
| TROY KING, et al., | ) | |
| | ) | |
| Defendants | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b) and the General Order of Reference regarding such matters in the Northern District of Alabama.  Plaintiff, James Tannehill, II, has filed a complaint against defendants Troy King, in his official capacity as Attorney General for the State of Alabama; Tommy Ragland, in his official capacity as Madison County Judge of Probate and in his individual capacity; Donna Geiger, in her official capacity as clerk in the Madison County Judge of Probate Office and in her individual capacity; Benjamin R. Rice; Ellen Melson; Jeffrey Enfinger; and Heritage Plantation, Inc. Plaintiff alleges violations of the Racketeer Influenced and Corrupt Organizations Act

(RICO), 18 U.S.C. § 1961, and makes other state law and constitutional claims.  The

following motions are pending before the court:

(1) Defendants Rice and Melson – Motion to Dismiss pursuant to Rule
12(b)(1), Fed.R.Civ.P. (Doc. # 17)[1]

(2) Defendants Rice and Melson – Motion to Dismiss pursuant to Rule
12(b)(6), Fed.R.Civ.P. (Doc. # 27)[2]

(3) Defendants Enfinger and Heritage Plantation, Inc. – Motion to
Dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. (Doc. #31)

(4) Defendants Ragland and Geiger – Motion to Dismiss pursuant to
Rule 12(b)(6), Fed.R.Civ.P. (Doc. #32)[3]

Subsequent to the filing of the motions to dismiss referenced above, the court

entered an order on July 27, 2008, giving plaintiff 30 days to file opposition to them.

Thereafter, defendants were to have 15 days to respond.  (Doc. #37).  On July 30,

2008, plaintiff was granted an extension of 60 days to respond to defendants' motions

to dismiss.  However, no response by plaintiff to any of these motions has been

---

[1] These defendants also filed a brief in support of the motion to dismiss (Doc. #18), as well as evidentiary material (Docs. #19 through 25 & 30).  Because the motion to dismiss by Rice and Melson is filed pursuant to Rule 12(b)(1), Fed.R.Civ.P., the court may consider the evidentiary material without converting the motion to a motion for summary judgment.  *See* Rule 12(d), Fed.R.Civ.P.

[2] Rice and Melson also filed two briefs in support of their motion to dismiss, one addressing the RICO claims and the other addressing the state law claims asserted against them. (Docs. #28 & 36).

[3] Ragland and Geiger also filed a brief in support of their motion to dismiss.  (Doc. #33).

received by the court.  The time for such response having passed, the undersigned magistrate judge submits the following report and recommendations on these motions.

## Complaint

Plaintiff, James Tannehill, proceeding *pro se*, alleges that he is a resident of the State of Colorado who is involved in a business venture he runs out of his home. Subsequently, a decision was made by plaintiff and his wife to relocate to Alabama. In the course of attempting to relocate, he alleges that they became involved in a dispute with a contractor, Mark Harris Homes, L.L.C., regarding the construction of a residence.  Plaintiff alleges that defendant Jeffrey Enfinger held an "indirect financial interest" through Enfinger-Steele Development, Inc.  The dispute resulted in a lawsuit seeking the recovery of $46,400 in earnest money, damages for breach of contract and fraud.  The property in question is referenced as the "Mt. Carmel Property" hereinafter.  It is valued by plaintiff at approximately $400,000.

Tannehill alleges that, after commencement of the lawsuit seeking the recovery of his earnest money, a notice of *lis pendens* was filed against the Mt. Carmel property with the Judge of Probate for Madison County.  The Judge of Probate for Madison County is defendant Tommy Ragland.  Also employed as a clerk for the Madison County Probate Court is defendant Donna Geiger.  According to Tannehill,

defendant and attorney Benjamin Rice subsequently made several attempts in the Circuit Court of Madison County to obtain relief from the *lis pendens* based on allegations of hardship and slander of title.   These attempts were unsuccessful. According to Tannehill, relief was denied because the *lis pendens* statute, *Ala. Code* § 35-4-137, provides for relief from a *lis pendens* only through the posting of a commercial surety bond in an amount equal to double the value of the property.

According to Tannehill, Rice, Melson and Enfinger then conspired to get around this statute by creating a scheme to defraud.   He asserts that they accomplished this by (1) creating a sham judicial proceeding in the Madison County Probate Court purporting to remove the *lis pendens* under due process, (2) fabricating a worthless bond styled as a "Real Property Bond to Transfer Lien," executed by Enfinger, to which to transfer the Tannehills' property and judgment interest in the Mt. Carmel Property, and (3) obtaining the Tannehills' property and judgment interest through theft, which was accomplished through a series of fraudulent acts carried out in the Probate Court of Madison County with the active assistance of Madison County Probate Judge Tommy Ragland.

According to Tannehill, in order to accomplish this scheme, the co-conspirators collaborated in "faking up authentic looking documents" which cited the *lis pendens* relief statute, *Ala. Code* § 35-4-137.   These documents then were given a probate

court case number.  These documents included a document which purported to be a "Petition for Bond Transfer Lien."  This document sought to transfer the Tannehills' property interest from the Mt. Carmel Property to a non-commercial bond instrument styled as a "Real Property Bond to Transfer Lien" executed by Enfinger as President of Heritage Plantation.

In the complaint, Tannehill alleges that proof that the Judge of Probate actively participated in this scheme is seen in the court filings of defendant Rice in the probate court proceeding wherein he states that counsel sought the assistance of the Probate Judge in preparation of a petition to remove the *lis pendens* under § 35-4-137 and that he (Rice) saw no other way to obtain the approval of the probate court than to ask the Court what type of bond it would approve.  Rice is further quoted as stating that he asked the probate court and the clerk's office for assistance in drafting such a petition. Rice additionally acknowledges having mailed a copy of the petition and the proposed bond and order to Tannehill's counsel (Jeffrey N. Lucas).

According to Tannehill, defendant Ellen Melson is an attorney who worked with Benjamin Rice and who was assigned the task of working with Geiger and Ragland to prepare the fraudulent petition, bond and other legal process undertaken to fulfill the scheme to effect the transfer of the *lis pendens* from the Mt. Carmel

Property to a purported Heritage Plantation, Inc., property put up as surety on the bond executed by Enfinger and Heritage Plantation, Inc.

In an affidavit filed in subsequent probate court proceedings, Melson stated that she was directed by Ben Rice to file a petition to remove the *lis pendens*. Being unfamiliar with the process, she contacted the Madison County Probate Clerk's Office and spoke, on numerous occasions, with defendant Donna Geiger. A petition was drafted which, after Melson spoke with Geiger and Ragland, it was determined should be called a "Petition to Transfer Lien." Tannehill notes that the *lis pendens* statute contains no provision for the removal of a *lis pendens* other than through the posting of a *commercial* surety bond.

Tannehill asserts that the petition thus created was a legal fiction coined by Ragland and Geiger and adopted by the other conspirators to create the false appearance of legitimate judicial process, all the while knowing that such a proceeding had no basis under Alabama law.

In addition to formulating the petition, Melson also was involved in creating a bond to secure the transaction. According to Melson herself, she sought the approval of the probate court to file a real property bond instead of a traditional commercial bond and was informed by the probate court that, if such were filed, it

would be approved.  Melson stated that she provided a description of the property which erroneously described the property as being in Madison County.

Tannehill asserts that he later determined that the property in the bond is located in Limestone County, Alabama, rather than Madison County and that its value is $571,000, far less than the $1,000,000 required by the *lis pendens* statute, which required a commercial bond at twice the value of the property in dispute.  Neither Enfinger nor Heritage Plantation, Inc., is authorized by law to issue commercial surety bonds.  Furthermore, the bond was not made payable to the Judge of Probate as required by § 35-4-137.

The petition and bond then were submitted to Judge Ragland.  The petition was signed by Melson for Rice.  The bond itself was signed by Enfinger.  According to Tannehill, all of the events leading up to the filing of the petition and the bond were concealed from him by the defendants.  Ragland granted the petition for transfer of the lien on September 8, 2006.

Melson and Rice thereafter prepared and executed a "Certificate of Transfer of Lien" and an "Order" directing that the real property bond signed by Enfinger, as President of Heritage Plantation, Inc., be received by the Clerk of Probate Court, recorded, and a copy sent to the Tannehills.  Tannehill alleges that these actions defrauded him and deprived him of the intangible right to the honest services of the

probate court.  His attorney received these documents on or about September 13, 2006, and the attorney, in turn, mailed them to the Tannehills.

According to Tannehill, on or about October 11, 2006, Ragland executed and caused to be sent by U.S. Mail an order vacating his September 8, 2006, actions.  On or about November 7, 2006, Ragland issued an order setting a hearing on the Tannehills' Petition to Alter/Amend Judgment/Order in which they sought compensation for their actual costs of reversing the illegal Petition to Transfer Lien and Real Property Bond to Transfer Lien.  At this point in time, Tannehill states that he was still unaware of Ragland's involvement and lack of impartiality in this matter.  According to Tannehill, Ragland only recused himself after his *ex parte* involvement came to light when exposed by Rice and Melson who implicated Ragland and Geiger to escape the assessment of costs.

However, Tannehill claims that Ragland continued to interfere in the proceedings by refusing for months to certify his disqualification to the Chief Justice of the Alabama Supreme Court pursuant to *Ala. Code* § 12-13-37.  Tannehill states that, after months of delay during which the probate court lost jurisdiction by operation of law, Ragland circumvented the provisions of § 12-13-37 by having a colleague in the Circuit Court send a letter to the administrator at the Alabama Administrative Office of Courts which was phrased in such a vague manner that it

covered up the fact that he was disqualified by his violation of *Ala. Code* § 12-13-16 which prohibits a probate judge or employee from participating in the preparation or assisting in the preparation of any paper, document or instrument which is to be heard or determined by that judge.

*Ala. Code* § 12-13-16 provides a monetary penalty which may be sought by any citizen of Alabama. Tannehill asserts that the wording of the statute limits the remedy's availability to citizens of Alabama. He states that he is left without remedy here because he is a citizen of the State of Colorado.

In Count One, Tannehill accuses all defendants of conducting the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and 1964(c). In Count Two, he accuses all defendants of conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1962(c) and (d) and 1964(c). In Count Three, Tannehill accuses Ragland and Geiger of a breach of fiduciary duty that caused Tannehill to suffer the loss of their honest services. Count Four accuses all defendants of common law fraud. Count Five accuses all defendants of wantonness. Count Six charges all defendants with fraudulent misrepresentation. Count Seven accuses Ragland, Rice, and Melson of fraudulent suppression. Count Eight accuses Ragland and Geiger of

violation of the due process clause of the Fourteenth Amendment, Article 1, Section 13 of the Alabama Constitution and *Ala. Code* § 12-13-16.

In Count Nine, Tannehill asserts that *Ala. Code* § 12-13-16 and another statute, *Ala. Code* § 6-5-50, violate the Privileges and Immunities Clause of the U.S. Constitution by virtue of the fact that they provide a remedy available only to citizens of the State of Alabama.  He lists Alabama Attorney General Troy King as the apparent defendant to this action, though he provides no explanation as to why this was done and asserts no acts performed by the Attorney General.

Likewise, in Count Ten he alleges that the limited applicability of these statutes violates the Equal Protection Clause of the U.S. Constitution.  In Count Eleven, he asserts that these statutes violate the Due Process Clause of the U.S. Constitution and Article 1, Sections 10 and 13 of the Alabama Constitution.  Again, Troy King is listed as the apparent defendant, though no acts by him are alleged.

In his *ad damnum* clause, plaintiff seeks monetary damages in the amount of $1,200,000 against the RICO defendants, an injunction against future racketeering activity, punitive damages, interest, court costs and attorney's fees.  He seeks to have the above-cited sections of the Alabama Code declared unconstitutional and to have the Attorney General enjoined from the enforcement of these code sections.

**State Court Proceedings**

Plaintiff and his wife filed an action in the Circuit Court of Madison County, Alabama, against Mark Harris Homes and Daniel and Laurie Brown with respect to the Mt. Carmel property. *Tannehill, et al. v. Mark Harris Homes, LLC, et al.*, Case No. 2004-184. Defendants Rice and Melson represented Mark Harris Homes in this litigation. Plaintiff filed a *lis pendens* against the Mt. Carmel property. The probate court action, *In re Lot 4, Block 1, River Run II of Mt. Carmel by the River*, Probate Case No. 49546, was filed by Mark Harris Homes to transfer the *lis pendens* to a bond so as to clear the title to the Mt. Carmel property. In the context of the probate court action, Tannehill accused Rice, Melson, Ragland, and Geiger of misconduct and conspiracy. Tannehill filed pleadings in the probate court action to recover his legal costs pursuant to *Ala. Code* § 12-19-270 through 276, as well as a petition to disqualify Rice and Melson from representing Mark Harris Homes in that litigation. The allegations ultimately were rejected. (*See* Doc. #30, Exs. 4 & 5). However, an order was entered to reimburse the Tannehills for approximately $4,000 in costs. (*See* Doc. #30, Ex. 3).

Tannehill filed a motion in the Circuit Court action to disqualify Rice and Melson from representing Mark Harris Homes, LLC, on July 3, 2007. The basis for this motion was the alleged collaboration of Rice and Melson with Ragland and

Geiger in "concocting and executing a fraud on the Probate Court" to transfer the *lis pendens* to the bond issued by Enfinger (the majority owner of Mark Harris Homes). (*See* Doc. #30, Ex. 11). He also expressed his intention to assert damages claims against them in the Circuit Court action. On November 5, 2007, the Tannehills filed a motion to amend their complaint in the Circuit Court action to assert claims for civil conspiracy and fraud against Enfinger and Heritage Plantation regarding the Petition to Transfer Lien filed in the probate court. (*See* Doc. #30, Ex. 12). It appears that at the time of the filing of defendants' Rule 12(b)(1) motion, these issues and motions were still pending before the state court.[4]

## I.   *Rooker-Feldman* Doctrine and *Colorado River* Abstention

Defendants Rice and Melson have asserted in their motion to dismiss pursuant to Rule 12(b)(1), Fed.R.Civ.P., that this court lacks jurisdiction over plaintiff's claims by application of the *Rooker-Feldman* doctrine. They contend that the claims raised here by plaintiff already have been the subject of state court litigation and this court is without jurisdiction to review the validity or overturn the outcome in the state courts. In the alternative, Rice and Melson assert that because plaintiff already has claims and motions containing the same or similar allegations pending against Rice

---

[4] Many of the records of the state court proceedings submitted by defendants Rice and Melson are outside the pleadings and are considered solely for purposes of the Rule 12(b)(1) motion of Rice and Melson. These records, to the extent they have not been submitted by plaintiff as exhibits to his complaint, are not considered for purposes of the pending Rule 12(b)(6) motions.

and Melson in the Circuit Court proceeding, this court should abstain from any ruling in favor of letting the state court handle the matter.

The Full Faith and Credit Clause, U.S. Const., Art. IV, implemented by 28 U.S.C. § 1738,[5] requires that federal courts afford the same full faith and credit to state court judgments that would be given by other courts of that state. *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985). The *Rooker-Feldman* doctrine prevents federal district and appellate courts from entertaining a process to reverse or modify a state court decision. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). The doctrine is a reflection of the principle that lower federal courts cannot review state court decisions. *Kamilewicz v. Bank of Boston Corp.*, 92 F.3d 506, 509 (7th Cir. 1996). Instead, only the Supreme Court has jurisdiction to review final judgments entered by state courts. *See* 28 U.S.C. § 157.

---

[5] Title 28 U.S.C. § 1738 provides in relevant part:

> The records and judicial proceedings of any court of any . . . State, Territory or Possession, . . . shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

Further, under the *Rooker-Feldman* doctrine, lower federal courts also lack jurisdiction over issues "inextricably intertwined" with state court judgments. *Goodman v. Sipos*, 259 F.3d 1327, 1332 (11th Cir. 2001). Although there is no bright line that separates a federal claim that is inextricably intertwined with a state court judgment from a claim that is not, "the underlying inquiry remains whether 'the district court is in essence being called upon to review the state-court decision.'" *Levin v. Attorney Registration and Disciplinary Comm'n of the Supreme Court of Ill.*, 74 F.3d 763, 766 (7th Cir. 1996) (citing *Feldman*, 460 U.S. at 483-84 n.16, 103 S.Ct. at 1316 n.16).

Four criteria must be met for the doctrine to apply: (1) the party in federal court is the same as in the state court; (2) the state court ruling was a final or conclusive judgment on the merits; (3) the plaintiff in federal court had a reasonable opportunity to raise federal claims in the state court proceeding; and (4) the issue before the federal court was either adjudicated by the state court or inextricably intertwined with its judgment. *Amos v. Glynn County Bd. of Tax Assessors*, 347 F.3d 1249, 1265 n.11 (11th Cir. 2003) (citations omitted). The doctrine is confined to cases that are "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp.*

*v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 1521-22, 161 L.Ed.2d 454 (2005).

In this case, James Tannehill is the plaintiff in this case and was the plaintiff in state court.  While defendants Rice and Melson were not defendants in the state court actions, they were respondents for purposes of the motions to disqualify filed in the probate court action and the circuit court action.  The probate court ruling rejecting the motion for disqualification based on allegations of misconduct is a final and conclusive ruling on such claims.  Plaintiff had the same opportunity to raise his claims of conspiracy and fraud against Rice and Melson in the state courts as he has had in this forum.  The issues before this court, regarding the lien and substitute bond and defendants' involvement in the procurement of the bond, were litigated in the state courts or are inextricably intertwined with the state court's judgment that rejected plaintiff's motion for disqualification.

The *Colorado River* abstention doctrine permits a federal court to abstain from exercising concurrent jurisdiction with a state court under certain exceptional circumstances.  *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817-21, 96 S.Ct. 1236, 1246-48, 47 L.Ed.2d 483 (1976).  *Colorado River* addresses the circumstances in which federal courts should abstain from exercising their jurisdiction because a parallel lawsuit is proceeding in one or more state courts.

Traditional abstention doctrines involve "considerations of proper constitutional adjudication and regard for federal-state relations . . . ." *Id.* at 817, 96 S.Ct. at 1246.[6] The general principle to avoid duplicative litigation does not apply, however, when the duplicative litigation arises between state and federal courts.  As the Supreme Court recognized, "[g]enerally, as between state and federal courts, the rule is that the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction. . . ." *Id.* (marks and citations omitted). Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Id.*  A policy permitting federal courts to yield jurisdiction to state courts cavalierly would betray this obligation.  Thus, federal courts can abstain to avoid duplicative litigation with state courts only in "exceptional" circumstances. *Id.* at 818, 96 S.Ct. at 1246.

The Supreme Court discussed several circumstances that district courts may consider.  It noted that "the court first assuming jurisdiction over property may

---

[6] In *Colorado River*, 424 U.S. at 814-16, 96 S.Ct. at 1244-46, the Court identified the following circumstances in which the traditional abstention doctrines apply:  (a) where cases presenting a federal constitutional issue might be mooted or presented in a different posture by a state court determination of pertinent state law; (b) where there have been presented difficult questions of state law bearing on policy problems of substantial public import and whose importance transcends the result in the case then at bar; and (c) where, absent bad faith, harassment, or a patently invalid state statute, federal jurisdiction has been invoked for the purpose of restraining (1) state criminal proceedings, (2) state nuisance proceedings antecedent to a criminal prosecution, which are directed at obtaining the closure of places exhibiting obscene films, or (3) collection of state taxes.

exercise that jurisdiction to the exclusion of other courts." *Id.*  It further remarked that a federal court may consider "the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the order in which jurisdiction was obtained by the concurrent forums." *Id.*, 96 S.Ct. at 1247 (citations omitted).  Finally, the Supreme Court cautioned that "[o]nly the clearest of justifications will warrant dismissal" of the federal action.  *Id.* at 819, 96 S.Ct. at 1247.  For abstention to apply, it is not necessary that the relevant federal and state cases share identical parties, issues, and requests for relief; it is enough if the federal and state proceedings involve substantially the same parties and substantially the same issues.  *Ambrosia Coal and Const. Co. v. Pages Morales*, 368 F.3d 1320, 1329-30 (11th Cir. 2004).

In interpreting *Colorado River* and its progeny, the Eleventh Circuit has identified six factors that must be weighed in analyzing the permissibility of abstention, namely:  (1) whether one of the courts has assumed jurisdiction over property, (2) the inconvenience of the federal forum, (3) the potential for piecemeal litigation, (4) the order in which the fora obtained jurisdiction, (5) whether state or federal law will be applied, and (6) the adequacy of the state court to protect the parties' rights.  *Am. Bankers Ins. Co. of Fla. v. First State Ins. Co.*, 891 F.2d 882, 884 (11th Cir. 1990).  In addition, "the vexatious or reactive nature of either the federal or the state litigation may influence the decision whether to defer to a parallel state

litigation under *Colorado River*."   *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 17 n.20, 103 S.Ct. 927, 937 n.20, 74 L.Ed.2d 765 (1983). "No one factor is necessarily determinative," *Colorado River*, 424 U.S. at 818, 96 S.Ct. at 1247, and "[t]he weight to be given to any one factor may vary greatly from case to case," *Moses H. Cone*, 460 U.S. at 16, 103 S.Ct. at 937.   The factors must be considered flexibly and pragmatically, not as a "mechanical checklist."  *Id.*  Finally, the abstention inquiry must be "heavily weighted in favor of the exercise of jurisdiction."  *Id.*

In this case, the Madison County Circuit Court and Probate Court assumed jurisdiction over the property at issue and the litigation by plaintiff.  The federal forum is not necessarily inconvenient for any party in this litigation.  However, there certainly is the potential for piecemeal litigation, with the state court deciding an issue one way and this court another.  The state courts obtained jurisdiction prior to the federal court.  In deciding most of the claims raised by plaintiff, state law will be applied, with the exception of the RICO claim.[7]  The state court is indeed adequate to protect the parties' rights, despite plaintiff's concern that he is being treated unfairly in the state court merely because he is not an Alabama resident and Jeff

---

[7] As discussed *infra*, plaintiff's RICO claim is subject to dismissal for failure to state a claim upon which relief can be granted, leaving only state law claims.

Enfinger was an Alabama legislator.  In fact, plaintiff's filings to date indicate he believes he is not being treated fairly in this court either.

Based on the foregoing, the magistrate judge finds that *Rooker-Feldman* bars plaintiff from relitigating claims of misconduct on the part of Rice and Melson because the issue already has been decided adversely to plaintiff in the probate court proceedings.  Further, the magistrate judge finds that *Colorado River* abstention is warranted with respect to the remainder of plaintiff's claims against Rice and Melson. Therefore, the magistrate judge finds that the motion to dismiss filed by Rice and Melson pursuant to Rule 12(b)(1) is due be granted.

In addition to the recommendation that this action be dismissed as against Rice and Melson based on *Rooker-Feldman* and *Colorado River*, the court also will address alternative grounds for dismissal of plaintiff's claims against Rice and Melson, as well as the other defendants.

## II.    RICO Claims (Counts One and Two)

In Counts One and Two, plaintiff asserts RICO claims against all defendants. He claims that defendants' actions as set out in his complaint violate 18 U.S.C. §§ 1962(c) and (d) and 1964(c).  Tannehill claims that Rice and Melson fraudulently conspired with Judge Ragland and Geiger in order to obtain an order that transferred

a *lis pendens* from one piece of property to another, in violation of law.  Tannehill

alleges that, in doing so, Rice and Melson violated 18 U.S.C. §§ 1862(c) and (d).[8]

_____

[8] The RICO statute, 18 U.S.C. § 1962, provides:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.  A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

Rice and Melson have moved to dismiss the RICO claims against them on the ground that plaintiff has failed to allege a "pattern of racketeering activity." (Doc. #27, Motion to Dismiss, ¶ 4).  They also allege that Tannehill has not suffered any cognizable RICO damages.  (*Id.* at ¶ 8).  Defendants Ragland and Geiger and Enfinger and Heritage Plantation, Inc. also assert that the RICO claims against them are due to be dismissed because Count One fails to allege a "pattern of racketeering activity" as required by statute and Count Two fails to allege a conspiracy to defraud sufficient to support a RICO claim.  Enfinger was not a party to the action in probate court.  He was involved only in relation to the bond issued to secure the substitute lien.  (Docs. #31 & 32, Motions to Dismiss).

The federal RICO statute permits "[a]ny person injured in his business or property by reason of a violation" of RICO's criminal provisions to recover treble damages and attorney's fees.  18 U.S.C. § 1964(c); *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 751 (11th Cir. 2000).  "The four elements of civil RICO liability are (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1311 (11th Cir. 2000).  "Plaintiffs in such an action must identify and prove a pattern of racketeering activity, defined as two 'predicate acts' of racketeering activity within a 10-year period."  *Id.* at 1311-12 (citing 18 U.S.C. § 1961(5)).  "The phrase 'racketeering activity' is defined

as any act which is indictable under a lengthy list of criminal offenses," including any act or threat involving murder, kidnaping, gambling, arson, robbery, extortion, bribery, mail fraud, wire fraud, counterfeiting, etc.  *Id.* at 1312; *see also* 18 U.S.C. § 1961(1).

However, "[s]ection 1961(5) concerns only the minimum number of predicates necessary to establish a pattern; and it assumes that there is something to a RICO pattern beyond simply the number of predicate acts involved."  *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 238, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989).  Under *H.J., Inc.*, predicate acts must be related to one other and must be continuous.  *Id.*

According to the Eleventh Circuit,

Continuity of racketeering activity may be proven "in a variety of ways," "depend[ing] on the specific facts of each case."  *H.J., Inc.*, 492 U.S. at 241-42, 109 S.Ct. at 2902.  In spite of the case-specific nature of the continuity inquiry, certain general principles guide the analysis. Continuity "is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition."  *Id.* at 241, 109 S.Ct. at 2902.  "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time."  *Id.* at 242, 109 S.Ct. at 2902.  Predicate acts "extending over a few weeks or months and threatening no future criminal conduct" do not suffice.  *See id.* at 242, 109 S.Ct. at 2902; *Jackson v. BellSouth Telecomms.*, 372 F.3d at 1265-66.

> By contrast, the "open-ended" theory of continuity relies not on a closed set of repeated prior acts committed over a substantial period of time, but instead on the "threat of continuity" extending into the future. *See Jackson v. BellSouth Telecomms*., 372 F.3d at 1265.

*United States v. Browne*, 505 F.3d 1229, 1259-60 (11th Cir. 2007).

Thus, as noted above, acts not extending over a substantial period of time and threatening no future criminal conduct are insufficient to establish a pattern in a close-ended period of continuity. The acts taken by defendants involved only plaintiff and his wife as putative victims. The order to transfer the lien has been withdrawn and dismissed, and there is no danger of future allegedly criminal activity. Consequently, plaintiff's claims do not reflect an open-ended continuity. This series of actions make up a "close-ended" period of continuity. However, the continuity of the acts alleged are insufficient to qualify as a pattern of racketeering activity.

In this case, the actions cited by plaintiff began in August 2006 and ended no later than November 2006. Thus, a period of approximately three months elapsed from the beginning to the end of this series of acts. The alleged acts involve one probate court proceeding involving one *lis pendens* that had been filed in relation to one civil suit. In a similar situation, the Eleventh Circuit found that the allegations lacked sufficient continuity to qualify as a RICO action:

> As the district court properly found, the plaintiffs' allegations plainly failed to allege facts sufficient to establish closed-ended continuity. While the plaintiffs generally alleged that the defendants committed

mail and wire fraud violations that extended "over a substantial period of time," Third Amended Complaint, paragraph 70, the specific incidents they actually charged began only on April 22, 1997, and ended, at the very latest, sometime in January 1998. Third Amended Complaint, paragraph 67. The plaintiffs maintain that no bright-line rule has been established definitively stating that nine months is too short a period to establish a "substantial period of time," for the purposes of closed-ended continuity. While the plaintiffs are correct that no court has unequivocally declared a minimum period of time that can be considered "substantial," the great weight of authority suggests that nine months is a wholly insufficient interlude. Any examination of the issue must begin with the Supreme Court's warning that *predicate acts "extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement . . . ." H.J. Inc.*, 492 U.S. at 242, 109 S.Ct. at 2902. This Circuit has determined that an alleged mail fraud scheme lasting approximately six months "was accomplished in too short a period of time . . . to qualify it as a pattern of racketeering activity." *Aldridge v. Lily-Tulip, Inc. Salary Ret. Plan Benefits Comm.*, 953 F.2d 587, 593 (11th Cir. 1992); *see also Hutchinson v. Wickes Cos., Inc.*, 726 F.Supp. 1315, 1320 (N.D.Ga. 1989) (questioning in *dicta* whether two years can be a "substantial period of time").

Other circuits have agreed that the substantial period of time requirement for establishing closed-ended continuity cannot be met with allegations of schemes lasting less than a year. *See, e.g., Efron v. Embassy Suites (P. R.), Inc.*, 223 F.3d 12 (1st Cir. 2000) (finding no closed-ended continuity where predicate acts occurred over 21-month period); *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (stating that the Second Circuit "has never held a period of less than two years to constitute a 'substantial period of time'"); *GICC Capital Corp. v. Tech. Fin. Group, Inc.*, 67 F.3d 463, 467-68 (2d Cir. 1995) (finding that courts of appeals have consistently considered eleven months to be insufficiently "substantial"); *Hughes v. Consol-Pennsylvania Coal Co.*, 945 F.2d 594, 611 (3d Cir. 1991) ("[T]welve months is not a substantial period of time."); *Menasco v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (finding no continuity when predicate acts with a single goal occurred over a one-year period);

*Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (finding seventeen-month period insufficient to show continuity); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 821 (7th Cir. 1991) (concluding that thirteen months is not a substantial period of time); *Wisdom v. First Midwest Bank of Poplar Bluff*, 167 F.3d 402, 407 (8th Cir. 1999) (holding that ten-month period is "too short" to constitute substantial period for purposes of closed-ended continuity); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 366-67 (9th Cir. 1992) ("We have found no case in which a court [of appeals] has held the [continuity] requirement to be satisfied by a pattern of activity lasting less than a year.").

The overwhelming weight of case authority suggests that nine months is not an adequately substantial period of time.  Moreover, the alleged racketeering activity was related to the settlement of a single lawsuit, and, notably, was not designed to perpetrate racketeering with respect to a series of cases.  Indeed, in cases like this one, where the RICO allegations concern only a single scheme with a discrete goal, the courts have refused to find a closed-ended pattern of racketeering even when the scheme took place over longer periods of time.  *See, e.g., Efron*, 223 F.3d at 18 (noting that "the fact that a defendant has been involved in only one scheme with a singular objective and a closed group of targeted victims" supports the conclusion that there is no continuity); *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C.Cir. 1995) (predicate acts occurring over three-year period insufficient to allege pattern of racketeering when complaint alleged a single scheme with a single goal); *see also Vicom, Inc. v. Harbridge Merchant Servs.*, 20 F.3d 771, 780 (7th Cir. 1994) (various factors besides temporal span should be considered in assessing continuity, including the number of victims, the presence of separate schemes, and the occurrence of distinct injuries); *Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1543 (10th Cir. 1993) (in addition to duration, weighing "extensiveness" of the RICO scheme, including number of victims, number and variety of racketeering acts, whether the injuries caused were distinct, the complexity and size of the scheme, and the nature or character of the enterprise or the unlawful activity); *United States v. Pelullo*, 964 F.2d 193, 208 (3d Cir. 1992) ("We have eschewed the notion that continuity is solely a temporal concept, though duration

> remains the most significant factor."); *U.S. Textiles, Inc. v. Anheuser-Busch Cos.*, 911 F.2d 1261, 1269 (7th Cir. 1990) ("[I]t is not irrelevant, in analyzing the continuity requirement, that there is only one scheme."(internal quotation marks and citation omitted)).
>
> In view of the narrow scope of the alleged racketeering activity and the limited time frame in which it is said to have taken place, the district court correctly held that the plaintiffs did not meet the closed-ended continuity requirement necessary to sustain a RICO violation. *Jackson I*, 181 F.Supp.2d at 1359.

*Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1266-67 (11th Cir. 2004) (footnote omitted) (emphasis added). The scope of the alleged racketeering activity extended over a period of only approximately three months and involved a single court order regarding a single *lis pendens* related to a single lawsuit prosecuted by only the plaintiff and his wife. Thus, the allegations contained in the complaint are insufficient to state a violation of the RICO statute as a matter of law. *See Fototec Int'l Corp. v. Polaroid Corp.*, 889 F.Supp. 1518, 1524 (N.D.Ga. 1995); *R.E. Davis Chem. Corp. v. Nalco Chem. Co.*, 757 F.Supp. 1499, 1510-11 (N.D.Ill. 1990) (one-scheme, one-victim allegations were not sufficient to find a pattern of racketeering activity, where although plaintiff alleged multiple acts of racketeering, including mail fraud, these acts occurred over a relatively short period of time and related to but a single scheme--the alleged attempt to misappropriate plaintiff's trade secret); *Homes By Michelle, Inc. v. Federal Sav. Bank*, 733 F.Supp. 1495, 1501 (N.D.Ga. 1990) (RICO's "pattern of racketeering activity" not satisfied where the

plaintiff alleged a series of illegal acts that spanned two years, but were aimed only at the plaintiff).

This is not to say that one-scheme, one-victim scenarios are never sufficient to show the necessary pattern of racketeering activity.  Indeed, the Supreme Court in *H.J., Inc.*, *supra*, and the Eleventh Circuit in *Bank of America Nat'l Trust & Sav. Ass'n v. Touche Ross & Co.*, 782 F.2d 966 (11th Cir. 1986), expressly rejected any *per se* rule that a pattern of racketeering activity cannot be shown based upon a single scheme and a single victim.  *H.J. Inc.*, 492 U.S. at 236-37, 109 S.Ct. at 2899-2900; *Touche Ross*, 782 F.2d at 971.  However, the focus remains upon whether plaintiff has pleaded facts that demonstrate either the commission of a "series of related predicates over a substantial period of time" or "past conduct that by its nature projects into the future with a threat of repetition."  *See H.J. Inc.*, 492 U.S. at 241-42, 109 S.Ct. at 2902.  The predicate acts that defendants allegedly committed during a three-month period of time are not long-term criminal activity occurring in a closed time period sufficient to constitute a pattern of criminal activity.

In addition, defendants assert that Tannehill was not injured  "in his business or his property" as required to state a case under 18 U.S.C. § 1962(c).  As indicated above, RICO's civil-suit provision states that "[a]ny person injured in his business or property by reason of" RICO's substantive provisions has the right to "recover

threefold the damages he sustains . . . ."  18 U.S.C. § 1964(c).  "The terms 'business or property' are, of course, words of limitation which preclude [certain forms of] recovery."  *Doe v. Roe*, 958 F.2d 763, 767 (7th Cir. 1992).  However, RICO is to be "liberally construed."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497-98, 105 S.Ct. 3275, 3285-86, 87 L.Ed.2d 346 (1985).  Accordingly, it must be determined whether the plaintiff has a "business or property" interest that could be injured under RICO. *Williams v. Mohawk Indus., Inc.*, 465 F.3d 1277, 1286 (11th Cir. 2006).

Plaintiff has failed to allege any direct injury to his business or property.  He has not claimed that the removal of the *lis pendens* caused him to suffer any quantifiable damages.  The lien was removed only for a period of about one month. He has not alleged that the property was sold or otherwise encumbered during this time.  Thus, he has failed to allege any proof of direct concrete financial loss.

Likewise, to the extent that plaintiff seeks to recover under RICO for personal injury, including emotional distress, or pecuniary losses resulting from personal injury, this claim is not cognizable under RICO.  *See Grogan v. Platt*, 835 F.2d 844 (11th Cir.), *cert. denied*, 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988).  In *Grogan*, the Eleventh Circuit stated:  "[i]n our view, the ordinary meaning of the phrase 'injured in his business or property' excludes personal injuries, including the pecuniary losses therefrom."  *Id.* at 847.  Thus, to the extent that plaintiff claims that

the emotional and mental distress he suffered from defendants' actions caused him an "injur[y] in his business or property," this claim is unavailing. *Pilkington v. United Airlines*, 112 F.3d 1532, 1536 (11th Cir. 1997).

The only potential damages that are actually quantifiable by plaintiff are those that result from the expenses associated with his travel from Colorado to Alabama to investigate the probate court action and the cost of attorney's fees in defending the action. Defendants assert that these injuries do not constitute injuries "in his business or property" as a matter of law. Defendants cite non-binding authority for this proposition, and it is not a position that is universally held. In *Local 355 Hotel, Motel, Restaurant & Hi-Rise Employees and Bartenders Union, AFL-CIO v. Pier 66 Co.*, 599 F.Supp. 761, 765 (S.D.Fla. 1984), cited by defendants, the district court held that the cost of attorney fees incurred by a labor union in fighting a decertification effort by the defendant that was undertaken in violation of RICO, were "incidental damages" that were not the type for which RICO provided compensation. *See also, Capasso v. Cigna Ins. Co.*, 765 F.Supp. 839, 842 (S.D.N.Y. 1991).

However, a contrary view holds that, in certain circumstances, such fees and costs are recoverable in a RICO action. In *Lemelson v. Wang Labs., Inc*., 874 F.Supp. 430 (D.Mass. 1994), the defendant filed lawsuits as part of the racketeering activity.

That court considered the costs thus expended in defense of the litigation by the

defendants as damages recoverable under RICO:

> The United States Supreme Court has held that a RICO injury must be proximately caused by a RICO violation. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496-497, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The persuasive authority holds that where legal fees are expended as an intended consequence of a defendant's racketeering activities, those fees may constitute RICO damages. *See Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1167 (2nd Cir. 1993) (upholding district court's award of attorneys' fees expended to defeat defendant's efforts to obstruct the collection of adverse judgments); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1105-1106 (2nd Cir. 1988) (allowing recovery of attorneys' fees incurred in exposing a fraudulent bankruptcy); *Malley-Duff & Associates, Inc. v. Crown Life Insurance Co.*, 792 F.2d 341, 354-355 (3d Cir. 1986) ("great expenses, delays and inconvenience" incurred in prosecuting a civil action over the obstructive tactics of defendant "were a sufficient pleading of injury to business or property to give [plaintiff] RICO standing"). *Cf. Hall American Center Association v. Dick*, 726 F.Supp. 1083, 1097 (E.D.Mich. 1989) (the filing of a lawsuit as part of a scheme to extort property may constitute a predicate act under RICO). *See generally*, D. Abrams, The Law of Civil RICO at 124-127 (1991). In the cases cited by plaintiff, litigation (or its threat) was neither an instrument of the racketeering activity nor a harm intended to the victim. As the court pointed out in *Capasso v. CIGNA Ins. Co.*, 765 F.Supp. 839, 842 (S.D.N.Y. 1991) (distinguishing *Malley-Duff, supra*), "[I]t cannot reasonably be suggested that the harm contemplated by the alleged fraudulent scheme was an increase in [plaintiff's] attorneys' fees." *See also Doe v. Roe*, 756 F.Supp. 353, 359 (N.D.Ill. 1991) ("[E]conomic aspects of personal injuries and injuries incidental to the racketeering acts are not compensable under RICO"). By contrast, DG alleges that the taxing of victims with the prospects of vexatious litigation is an integral component of the racketeering scheme. Where, as here, the institution of a lawsuit is alleged to be an instrument of racketeering activity, I hold that the costs incurred in investigating and defending that

litigation are a sufficient RICO injury to satisfy the indulgent pleading requirements of Rule 12(b)(6).

*Lemelson*, 874 F.Supp. at 433 (footnote omitted).

In view of the fact that the probate court litigation in this case was the basis for the RICO claim, the reasoning in *Lemelson* is compelling.  However, given that plaintiff's claim does not amount to a valid RICO claim, the reasoning is also irrelevant.  Since a finding on this issue is unnecessary, the undersigned magistrate judge declines to do so.  It is offered for informational purposes in the event a reviewing court declines the undersigned's recommendation.

## III.   Breach of Fiduciary Duty, Denial of Due Process and Violation of *Ala. Code* § 12-13-16 (Counts Three and Eight)

Plaintiff contends defendants Ragland and Geiger breached their fiduciary duties as Probate Judge and Probate Court Clerk, denied plaintiff due process and violated § 12-13-16 of the Alabama Code, by their actions in connection with the Mt. Carmel property.  It is clear from the complaint that plaintiff's claims against Ragland and Geiger relate to Judge Ragland's position as Probate Judge and to actions taken by Judge Ragland in his capacity as a Probate Judge.  Likewise, it is clear that, at all times relevant to plaintiff's claims against her, Geiger was acting under the direction and as an employee of Judge Ragland.

Because all of the actions performed by Judge Ragland were performed in his capacity as a Probate Judge for Madison County, Alabama, he is absolutely immune from suit. A judge is not immune from liability only in two instances, *i.e.*, for non-judicial actions and for actions, though judicial in nature, taken in the complete absence of all jurisdiction. *Mireles v. Waco*, 502 U.S. 9, 11-12, 112 S.Ct. 286, 288, 116 L.Ed.2d 9 (1991) (citations omitted).

The actions taken by Judge Ragland were in regard to real property. It is a normal function of the probate court to execute orders regarding real property. These actions were taken in relation to a pending probate case over which Judge Ragland presided in his official capacity. Even assuming that Judge Ragland acted in excess of his jurisdiction in approving the removal of the *lis pendens* in a manner not authorized by state law, this action is merely in excess of his jurisdiction, not in absence of all jurisdiction. Consequently, he is entitled to absolute immunity. *Stump v. Sparkman*, 435 U.S. 349, 357 n.7, 98 S.Ct. 1099, 1105 n.7, 55 L.Ed. 2d 331 (1978). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the "clear absence of all jurisdiction." *Id.* at 356-57, 98 S.Ct. at 1105 (citation omitted). Consequently, the claims against Judge Ragland are due to be dismissed based on his judicial immunity.

Geiger is also entitled to the benefit of Judge Ragland's judicial immunity.

"'Nonjudicial officials are encompassed by a judge's absolute immunity when their

official duties "have an integral relationship with the judicial process." *Ashbrook v.*

*Hoffman*, 617 F.2d 474, 476 (7th Cir. 1980). Like judges, these officials must be

acting within the scope of their authority." *Roland v. Phillips*, 19 F.3d 552, 555 (11th

Cir. 1994). In his complaint, Tannehill alleges that Geiger "act[ed] under the

direction of Ragland." (Doc. #1, Complaint, at ¶ 17). Likewise, the facts alleged by

Tannehill reflect that the acts that Geiger performed were done pursuant to Judge

Ragland's directions and in her capacity as a clerk for Judge Ragland. Therefore, she

is also entitled to judicial immunity, and the claims against her are due to be

dismissed.

Both Ragland and Geiger are also entitled to qualified immunity.

Qualified immunity is " immunity from suit rather than a mere defense
to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806,
2815, 86 L.Ed.2d 411 (1985). The doctrine of qualified immunity is
intended to protect government officials performing discretionary
functions from the burdens of trial and broad-reaching discovery in
cases that are insubstantial or that do not allege violations of clearly
established law. *Id.* at 526, 105 S.Ct. at 2815; *Harlow v. Fitzgerald*, 457
U.S. 800, 818, 102 S.Ct. 2727, 2738-39, 73 L.Ed.2d 396 (1982). In
particular, qualified immunity avoids "distraction of officials from their
governmental duties, inhibition of discretionary action, and deterrence
of able people from public service." *Harlow*, 457 U.S. at 816, 102 S.Ct.
at 2737. *Accord Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815. These
important purposes of qualified immunity are thwarted if a case is
erroneously permitted to go to trial. *Mitchell*, 472 U.S. at 526, 105 S.Ct.

at 2815.  Police officers on the beat, who daily risk their lives to defend society and preserve our system of ordered liberty, are certainly among those government officers that qualified immunity is meant to protect. In my view, the case before us is precisely the type of case that qualified immunity is designed to resolve.

The applicability of qualified immunity is a question of law to be decided by the court.  *Ansley v. Heinrich*, 925 F.2d 1339, 1341, 1345 (11th Cir. 1991).  To invoke the affirmative defense of qualified immunity, a defendant public official initially bears the burden of proving that he was acting within the scope of discretionary authority when the allegedly wrongful acts occurred.  *Rich v. Dollar*, 841 F.2d 1558, 1563 (11th Cir. 1988).  Once the defendant public official satisfies this burden, the burden then shifts to the plaintiff to show that the actions of the defendant public official, at the time they occurred, violated clearly established law.  *Id.* at 1564.  The defendant public official is entitled to qualified immunity as a matter of law if either (1) the applicable law was not clearly established at the time of the alleged violation, or (2) the plaintiff fails to demonstrate the existence of genuine issues of material fact as to whether the defendant public official's actions violated the clearly-established law. *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815; *Rich*, 841 F.2d at 1564.

*Harrell v. Decatur County, Ga.*, 22 F.3d 1570, 1577-79 (11th Cir. 1994).

Plaintiff alleges that these defendants deprived him of due process by entering the order that allowed the *lis pendens* to be temporarily lifted.  However, he fails to detail just how this deprived him of due process.  One month after Judge Ragland transferred the *lis pendens*, he rescinded the order.  Tannehill lost no property or any right to that property.  Even assuming that the actions of Judge Ragland were in violation of Alabama law, the action taken was reversed.  Thus, plaintiff cannot say

that he has been denied any clearly established right under constitutional or statutory law.

Judge Ragland was acting in a judicial capacity at the time he signed the order transferring the *lis pendens*. Thus, at that time, he was a state, and not a county, actor. *See* Alabama Constitution of 1901, Art. VI, § 144. The actions taken by Geiger were performed at the direction of Judge Ragland acting in his judicial capacity. As such, Judge Ragland and Clerk Geiger are entitled to Eleventh Amendment immunity. *See Perkins v. U.S. Fidelity & Guaranty Co.*, 433 F.2d 1303 (5th Cir. 1970).[9]

## IV. Fraud, Fraudulent Misrepresentation and Fraudulent Suppression (Counts Four, Six and Seven)

Count Four accuses all defendants of common law fraud. Count Six charges all defendants with fraudulent misrepresentation. Count Seven accuses Ragland, Rice, and Melson with fraudulent suppression. These claims are also due to be dismissed.

*Ala. Code* § 6-5-101 provides:

> Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

---

[9] The Eleventh Circuit, in the *en banc* decision of *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981), adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.

In *George v. Associated Doctors Health & Life Ins. Co.*, 675 So.2d 860, 862 (Ala. 1996), the Alabama Supreme Court explained the elements that must be proven to establish fraud:

> Regardless of whether the representation is made willfully, recklessly, or mistakenly, a plaintiff alleging fraud must prove four elements:  (1) a false representation; (2) that the false representation concerned a material existing fact; (3) that the plaintiff relied upon the false representation; and (4) that the plaintiff was damaged as a proximate result of the reliance.

The only alleged fraudulent acts by these defendants are the instigation of the legal action seeking relief from the *lis pendens* which included the preparation of documents initiating those proceedings, as well as others that reflect that the substitute property was located in Limestone County, rather than Madison County, and a document apparently indicating that the substitute property had a value in an amount equal to double the value of the property in dispute, which plaintiff alleges to be approximately $1 million, when, in fact, it was worth only $570,000.

There is no allegation that plaintiff relied on any alleged fraudulent misrepresentations made by any defendant.  To the contrary, plaintiff thoroughly investigated everything that took place in this case.  Nothing led him to act to his detriment in reasonable reliance thereon.

Although plaintiff asserts that the cause of action filed in probate court was a "sham judicial proceeding," he has failed to demonstrate how this is so.  Simply

because the attempt was made to obtain relief from the *lis pendens* in a manner not authorized by statute does not make the proceeding a sham.  According to the complaint, plaintiff received notice of the proceedings and was represented by counsel.  Ultimately, he prevailed in his quest to prevent the substitution of the property when the order transferring the *lis pendens* was withdrawn.  He has failed to allege why this proceeding, which ended in his favor, was a "sham."  The value of the substitute property, while less than that required by statute, was sufficient to cover the cost of any judgment in favor of plaintiff.  Likewise, the proceedings were part of a case openly filed in probate court and in which counsel for plaintiff, Jeffery Lucas, received notice.  Although the order initially entered and ultimately set aside may have been issued contrary to state law, the proceedings were by no means a sham.

Likewise, the elements of a fraudulent suppression claim are "'(1) a duty on the part of the defendant to disclose facts; (2) concealment or nondisclosure of material facts by the defendant; (3) inducement of the plaintiff to act; and (4) action by the plaintiff to his or her injury.'"  *Freightliner, L.L.C. v. Whatley Contract Carriers, L.L.C.*, 932 So.2d 883, 891 (Ala. 2005) (quoting *Lambert v. Mail Handlers Benefit Plan*, 682 So.2d 61, 63 (Ala. 1996)).

There is no allegation by plaintiff that he relied on the alleged misrepresentations by Enfinger and Heritage Plantation, Inc. In fact, his complaint reflects just the opposite. He questioned and challenged virtually everything. There is no allegation by plaintiff that he relied on any representation by these defendants.

With regard to the fraudulent suppression claim, even assuming plaintiff's claims to be true, it is questionable as to whether any material fact was suppressed. The fact that the property to which the lien was transferred is in Limestone County is immaterial. This fact could not have had any conceivable effect on the value of the property. Likewise, the property value, while less than that required by statute, was sufficient to cover the cost of any judgment in favor of plaintiff.

In any event, there is no evidence that plaintiff relied on or was induced to act by any alleged misrepresentation made by these defendants. Therefore, he has failed to make out a claim of fraudulent suppression and Counts Four, Six, and Seven are due to be dismissed. In addition, Counts Four, Six, and Seven are due to be dismissed as against defendants Ragland and Geiger based on absolute, qualified and Eleventh Amendment immunity, as discussed *supra*.

## V.  Wantonness

Count Five accuses all defendants of wantonness. Because no cause of action exists for RICO or the fraud-related counts, there is no basis on which to make a

claim of wantonness.  Plaintiff's claim of wantonness is vague at best.  He complains that the judicial process that resulted in the transfer of the *lis pendens* was wanton conduct.   In particular, he asserts that (1) the parties took part in *ex parte* communications regarding the preparation of the motion to transfer the *lis pendens*; (2) Judge Ragland failed to disqualify himself from participating in a proceeding in which he had participated in preparing and pre-approving documents; (3) probate court personnel provided legal advice and assistance which constituted the unlicensed practice of law; (4) Judge Ragland's actions in assisting in the preparation of documents amounted to practicing law while serving as a judge, in violation of state law; (5) Judge Ragland transferred the *lis pendens* lien in a manner not authorized by state law; and (6) Judge Ragland took a bond from an unauthorized/unlicensed surety on property not located in Madison County and not recorded in the Madison County Probate Court records.

Plaintiff further asserts that, as a result of these parties' actions, plaintiff's interest in the Mt. Carmel property was transferred to a bond proffered by Enfinger. He claims this has resulted in substantial damages but gives no specifics.

The probate court action in this case took place while plaintiff was represented by counsel, Jeffery Lucas.  According to the complaint, Lucas was mailed notice at all stages of the proceedings.  The action in probate court was given a case number

and, while the court initially entered an order not authorized under state law, the order later was rescinded.  During the time this order was in effect, plaintiff's interest in the Mt. Carmel property was not diminished in any way.  Although probate court personnel should not have participated in the drafting of the petition to transfer the *lis pendens*, as noted above, Judge Ragland and Geiger are entitled to absolute, qualified and Eleventh Amendment immunity with regard to plaintiff's tort claims. In any event, this act alone, or in combination with plaintiff's other claims of misconduct, simply does not amount to wanton misconduct.  Consequently, Count Five is due to be dismissed as to all defendants.

## VI.    Claims for Injunctive Relief (Counts Nine and Ten)

In Count Nine, Tannehill asserts that *Ala. Code* §§ 12-13-16 and 6-5-50 violate the Privileges and Immunities Clause of the U.S. Constitution by virtue of the fact that they provide a remedy available only to citizens of the State of Alabama.  He lists Alabama Attorney General Troy King as the apparent defendant to this claim, though he provides no explanation as to why this was done and asserts no acts performed by the Attorney General.

Likewise, in Count Ten he alleges that the limited applicability of these statutes violate the Equal Protection Clause of the U.S. Constitution.  In Count Eleven he asserts that these statutes violate the Due Process Clause of the U.S. Constitution and

Article 1, Sections 10 and 13 of the Alabama Constitution. Again, Troy King is listed as the apparent defendant, though no acts by him are alleged.

The Attorney General for the State of Alabama notes that this dispute is one involving private parties. It further notes that the two statutes regarding which plaintiff seeks an injunction are statutes which do not apply to the Office of the Alabama Attorney General. There is no claim that plaintiff has made any attempt to initiate litigation in state court under the alleged offending statutes. Thus, he has not given the courts of the State of Alabama the opportunity to rule on the issues he raises in Counts Nine and Ten of his complaint.

A federal court may and should *sua sponte* examine whether it has jurisdiction over a claim before reaching the merits of any such claim. *See Kelly v. Harris*, 331 F.3d 817, 819 (11th Cir. 2003) (affirming *sua sponte* dismissal by district court for lack of case or controversy).

In *Railroad Comm. of Texas v. Pullman*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), the Supreme Court determined that a federal court should refrain from exercising jurisdiction over a constitutional challenge to state action if the resolution of an unsettled question of state law promises to dispose of the case without the need for constitutional adjudication. *See generally* C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4242 (1978). Justice Rehnquist, writing for the

Supreme Court in *Moore v. Sims*, 442 U.S. 415, 428, 99 S.Ct. 2371, 2379, 60 L.Ed.2d 994 (1979), pointed out "three distinct considerations that counsel abstention when broad-based challenges are made to state statutes," and observed that "it is common to see each figure in an abstention decision."   Briefly stated, these three considerations are:  (1) the *Pullman* concern that a federal court's constitutional adjudication will be rendered nugatory by a subsequent state court decision interpreting differently the challenged state statute; (2) the concern for assuring a concrete Article III case or controversy; and (3) the "Federalism" concern for avoiding interference with the construction of state law by state courts.  442 U.S. at 428-29, 99 S.Ct. at 2379-80.  The two-pronged predicate for *Pullman* abstention articulated by the old Fifth Circuit is:  "(1) there must be an unsettled issue of state law; and (2) there must be a possibility that the state law determination will moot or present in a different posture the federal constitutional question raised."  *Palmer v. Jackson*, 617 F.2d 424, 428 (5th Cir. 1980).[10]

As noted above, plaintiff's challenge here has provided no opportunity for the statute to be interpreted by the state court.  The statute is ambiguous regarding whether it is a remedy which has its availability limited to citizens of the State of Alabama.  Thus, the existence of unsettled state law issues is manifest.

---

[10] *See* fn. 2, *supra.*

The second precondition for *Pullman* abstention is also met.  Alabama courts may interpret the statute in a manner that comports with constitutional guarantees of due process and equal protection.  In that event, plaintiff's claims could be moot.  The state courts may, on the other hand, interpret the statute in a manner that reveals a conflict between the Legislature's intent and the federal constitutional rights of non-resident citizens.  Until state courts definitively construe the statute, prior decisions of the U.S. Supreme Court counsel that courts should be reluctant to interpose a constitutional ruling based upon intuitive perception of unsettled state law issues.[11]  The *Pullman* concern presents itself strongly in this case.

In addition, in order to qualify for federal court adjudication, "an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975) (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n.10, 94 S.Ct. 1209, 1216 n.10, 39 L.Ed.2d 505 (1974)) (internal quotation marks omitted).  Plaintiff

---

[11] *See, e.g., Huffman v. Pursue, Ltd.*, 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975) (ordering abstention in suit challenging the constitutionality of Ohio nuisance statute closing theaters that show obscene films); *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (ordering abstention in suit challenging state statute authorizing contempt proceedings to enforce civil judgment debts); *Trainor v. Hernandez*, 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977) (ordering abstention in suit challenging the constitutionality of state procedures for attaching the property of welfare recipients charged with fraudulently concealing assets in their application for public assistance); *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979) (ordering abstention in suit challenging the constitutionality of Texas child protection laws).

has never filed a suit seeking a remedy under the state statute he now seeks to enjoin. Thus, there is no case or controversy and, therefore, no jurisdiction to consider these claims. Consequently, plaintiff's claims in Counts Nine and Ten are due to be dismissed without prejudice for lack of jurisdiction. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 1068-69, 137 L.Ed.2d 170 (1997).

## CONCLUSIONS

Based on the foregoing analysis, the magistrate judge RECOMMENDS that:

(1)    the Rule 12(b)(1) Motion to Dismiss of defendants Rice and Melson (Doc. #17) be GRANTED and all claims asserted by plaintiff against these defendants be DISMISSED WITH PREJUDICE;

(2)    the Rule 12(b)(6) Motion to Dismiss of defendants Rice and Melson (Doc. #27) be GRANTED and the RICO claims asserted by plaintiff against these defendants be DISMISSED WITH PREJUDICE;

(3)    the Rule 12(b)(6) Motion to Dismiss of defendants Enfinger and Heritage Plantation, Inc. (Doc. #31) be GRANTED and all claims asserted by plaintiff against these defendants be DISMISSED WITH PREJUDICE;

(4)     the Rule 12(b)(6) Motion to Dismiss of defendants Ragland and Geiger (Doc.

#32) be GRANTED and all claims asserted by plaintiff against these

defendants be DISMISSED WITH PREJUDICE; and

(5)     *sua sponte* and *ex mero motu*, that Counts Nine and Ten be DISMISSED

WITHOUT PREJUDICE.


### NOTICE OF RIGHT TO OBJECT

The parties are DIRECTED to file any objections to this Report and

Recommendation within a period of eleven (11) days from the date of entry.  Any

objections filed must specifically identify the findings in the magistrate judge's

recommendation objected to.  Frivolous, conclusive, or general objections will not be

considered by the district court.

Failure to file written objections to the proposed findings and recommendations

of the magistrate judge's report shall bar the party from a *de novo* determination by

the district court of issues covered in the report and shall bar the party from attacking

on appeal factual findings in the report accepted or adopted by the district court

except on grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677

F.2d 404 (5th Cir. Unit B 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33

(11th Cir. 1982).  *See also Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en*

*banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit

handed down prior to the close of business on September 30, 1981.

DONE this 13th day of February, 2009.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE